**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO.1:13CR0009** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **GEZIM SELGJEKAJ,** | ) | **COURT'S RULING ON THE** |
| | ) | **PARTIES' DISPUTED LOSS** |
| | ) | **AMOUNT AND ENHANCEMENTS** |
| | ) | **FOR PURPOSE OF DETERMINING** |
| | ) | **DEFENDANT'S SENTENCING** |
| | ) | **GUIDELINE OFFENSE LEVEL** |
| | ) | |
| **Defendant.** | ) | |

**CHRISTOPHER A. BOYKO, J:**

 The Court, having received Defendant's Objections to the loss amount and enhancements attributed to the Defendant by the Probation Officer, and the Government's response contained in its Sentencing Memorandum, issues the following Ruling to assist the parties in preparing for, and streamlining, Defendant's Sentencing on December 22, 2015 at 10:00 A.M.

 On January 3, 2013, Defendant Gezim Selgjekaj ("Defendant")was named in a thirty count indictment with two co-defendants, Artur Hoxha and Judmir Capoj, arising out of the

collapse of the St. Paul Croatian Federal Credit Union ("SPCU").  At the time, the SPCU collapse was the largest in United States history.  Defendant was charged with one count of Conspiracy to Commit Financial Institution Fraud, fifteen counts of Financial Institution Fraud, four counts of Bribery and six counts of Money Laundering.  After a jury trial, Defendant was convicted on all but one count (Count 21) of Bribery.  Defendant is set for sentencing on December 22, 2015.  This matter arises from Defendant's challenges to the Probation Department's sentencing range calculation.

"In determining the total loss attributable to Defendants, the Court must take the greater of the actual loss or intended loss."  *United States v. Vysniuaskas*, No. 10 20717, 2011 WL 5433960, at *4 (E.D. Mich. Nov. 9, 2011) citing U.S.S.G. § 2B1.1, cmt. (n.3(a)). "[A]ctual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" is "the pecuniary harm that Defendant purposely sought to inflict" and "includes intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1, cmt. n. 3(A)(i) and (ii); *United States v. Triana,* 468 F.3d 308 (6th Cir.2006).  Under 2B1.1, as of November 1, 2015, losses of more than $3,500,000 and up to $9,500,000 result in a guideline increase of 18 levels.  For losses of more than $9,500,000 and up to $25,000,000 Defendant receives an increased offense level of 20.   2B1.1 cmt. nt. 3(C) reads "The court need only make a reasonable estimate of the loss."  2B1.1 cmt n. 3(D)i excludes from loss calculations "interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs."

The Probation Department determined the amount of loss attributable to Defendant is $16,309,563.85 and further determined his total offense level to be 38.  The Probation

Department determined that Defendant's base level offense was 7 for Money Laundering

under 18 U.S.C. § 1957.  Because the amount of loss as calculated by the Probation

Department was $16,309, 563.85, the guidelines add 20 levels.  Because his offense

substantially jeopardized "the safety and soundness of a financial institution" the Probation

Department added four levels. Pursuant to U.S.S.G. § 2S1.1(b)(2)(A), a one level increase is

added because he was convicted under 18 U.S.C. § 1957.  An additional 2 level increase was

added due to Defendant's role in the offense as an organizer, leader, manager, or supervisor

of his co-defendants.  Lastly, an additional 2 level increase was added for Defendant's

obstruction of justice related to his perjury at trial when he denied bribing Raguz.  Therefore,

the Probation Department calculated Defendant's total offense level at 38.

Defendant challenges the 20 level enhancement based on the amount of the actual

loss.  He further challenges the 2 level increase for his alleged role in the offense, the 2 level

obstruction increase and the 4 level increase for substantially jeopardizing the soundness and

safety of a financial institution.

As an initial matter, the Court has already addressed in its Opinion and Order of

September 3, 2015, that Defendant conspired with Raguz to defraud the SPCU.  That

Defendant received quarterly statements from the SPCU showing resets on the loans.  The

Court's Opinion and Order found the evidence at trial demonstrated Defendant gave Raguz

names of Defendant's relatives in order to open false accounts in the relatives names, often

without their knowledge in order to hide the fraudulent loans made to Defendant and his

affiliated entities.  The evidence further supported the Government's contention that

Defendant received loans while he was incarcerated on an unrelated matter and had portions

3

of the loans delivered to him or other inmates.

**<u>Actual loss</u>**

According to Defendant,  the $16,309,563.85 figure does not represent actual losses caused by Defendant's conduct because it includes interest accrued from the date of the loans, which is improperly added under Section 2B1.1cmt. nt. 3(D)i.  The Government counters that when the loan balances became too high, Defendant agreed to loan resets wherein Raguz combined the interest and principal owed on old loans that were in default and "reset" them by creating new loans to make payments on the old ones.   By rolling the interest and principal into a new loan, the Government contends Defendant created new principal that included the previously owed interest.  Therefore, actual loss in this circumstance includes interest because it was subsequently converted into principal.  Furthermore, the Government argues that 3D(i)'s interest exclusion applies only to post-conduct interest.  The Government relies on *United States v. Pouparina*, 577 F. App'x 939, 941 (11th Cir. 2014), wherein the Eleventh Circuit, in finding that closing costs were not excluded from the loss calculation, held "[t]he purpose of that application note is to ensure that 'the offense level for a financial crime is not increased if the prosecution is delayed, even though the delay increases the cost of the crime.'" *Quoting United States v. Peel,* 595 F.3d 763, 772 (7th Cir.2010).  Based on this holding, the Government argues only interest that accrues post-conduct is precluded from a loss calculation.  Thus, the government contends that because Defendant knew of, applied for and approved of the loan resets, he cannot challenge the inclusion of unpaid interest, rolled into new loans as new principal as actual loss.

There is very little case law applicable to this situation, however, the Court finds that

the plain language of the Sentencing Guidelines, plus the limited caselaw available, militates in favor of excluding interest in the loss calculation.  First, the express language of Section 2B1.1 cmt n. 3(D)(i) proscribes including interest "of any kind" from the loss calculation.  In *U.S. v. Dunn,* 300 Fed. App'x. 336 (6th Cir. 2008), the Sixth Circuit determined a district court improperly included interest accrued on unpaid child support payments in its loss calculation.  The Sixth Circuit held that the Sentencing Guidelines Manual's Commentary is authoritative and that 2B1.1 cmt. n. 3(D)(i) proscribes including interest in a loss calculation. This holding is consistent with those in other circuits.  In *U.S. v. Turk*, 626 F.3d 743 (2nd Cir. 2010), the Second Circuit determined that the appropriate loss calculation for a mortgage fraud scheme was the unpaid principal.  In *U.S. v. Morgan*, 376 F.3d 1002(9th Cir. 2004), the Ninth Circuit held the "district court erred in including contractual interest in its loss calculation."[1]  This Ninth Circuit holding strikes closest to the heart of the issue here where interest owed on the loans is contractual interest and the Court holds that any contractual interest accrued on Defendant's loans must be backed out of the loss calculation.  Therefore,

---

[1]  The Ninth Circuit in *Morgan* was also confronted with an issue presented in this case but not discussed in depth.  Defendant was indicted on January 3, 2013, and convicted on February 26, 2015.  His sentencing is set for December 22, 2015.  On November 1, 2015 the U.S.S.G Manual was amended.  Thus, there is a concern that applying the 2015 Amended Sentencing Guidelines presents an *Ex Post Facto* issue. "A retrospective increase in the Guidelines range applicable to a defendant creates a sufficient risk of a higher sentence to constitute an *ex post facto* violation." *Peugh v. United States*, 133 S. Ct. 2072, 2084. (2013).  The Probation Department's offense level calculation is based on the 2014 Guidelines.  The Court finds that there are no changes to the base level offense of sentencing guidelines affecting Defendant's guideline rages.  Nor are there any relevant changes between the Sentencing Guidelines dating from 2009 to the present Sentencing Guidelines of December 2015.  Of significance to Defendant, the Loss table found in 2B1.1(b)(1) increased the amount of loss for each level increase.  Therefore, using the 2015 Amended Guideline inures to the benefit of the Defendant.  The Amended Sentencing Guidelines Manual did not increase the level for the offenses Defendant was found guilty of violating.  Therefore, the Court will apply the November 1, 2015 Guidelines because it does not create an *Ex Post Facto* issue.

when removing accrued interest from the loss calculation, the Court finds actual losses of $9,364,204.72, using the figures of the loan reconstructions relied on by both parties and incorporated into the Government's Supplemental Brief at pages 8-9.

This figure does not include the following losses the Government has agreed not to include:

The Government agrees not to include a $60,000 deposit into the account of George Plavic originally included in its calculation of loss as to count 4 under the Great Lakes Produce Account.  The Government further agrees not to include in its loss calculation $70,176.22 under Count 15 relating to Ristorante Luciano/Gusto d'Italia, a restaurant venture Defendant entered into that was managed by Judmir Capoj.  Moreover, the Government agrees no to include $60,000 again relating to Capoj arising out of Count 16 and the Eastside Farmer's Market.  Also, the Government agrees not to include $29,606.88 relating to the Pamela Goldsmith Account.

The parties dispute whether an additional $279,899.16 should be included in the loss calculation.

Defendant contends the disputed amount was paid on behalf of Frank Penavic to settle claims against Penavic and Great Lakes Produce brought by produce suppliers under the Perishable Agricultural Commodities Act ("PACA").  According to Defendant, this happened without Defendant's knowledge.

The Government contends this amount was paid by Raguz drawing money from the Jimmy's Trucking account, a Defendant-related entity, to settle the PACA suits.  According to Raguz's testimony at trial, Raguz had a phone conversation with Defendant while

Defendant was incarcerated in Florida.  Raguz testified that Defendant agreed to pay the settlement payments on the PACA suits. (See Trial Transcript pg. 1187).   The Government puts the loan proceed figure at $600,000 but because Raguz created a number of fictitious accounts without Defendant's knowledge that were unrelated to Defendant or his affiliated entities, the Government includes only the above amount drawn on an undisputed Defendant-related account.

The Court holds that Raguz's testimony at trial established Defendant agreed to pay the settlement amounts on the PACA suits and that the loan reconstruction properly places this figure as $279,899.16, drawn from the Jimmy's Trucking account, an account trial testimony clearly connected to Defendant.  Therefore, the Court finds this amount is properly considered part of the actual loss.

The parties further dispute whether monies obtained by Defendant from SPCU prior to the indictment period are properly included in the loss calculation.  These loans include $257,469.93 to Jimmy's Trucking, $316,944.80 to Defendant's personal account, $113,000 to RGV Enterprises and $347,604.39 to Top Quality Produce.  According to Defendant, there was no testimony or evidence at trial demonstrating that Defendant paid any bribes as an inducement to receive the loans.   The Government counters that the evidence at trial demonstrates that these pre-indictment loans were rolled into the fraudulent loans with the full knowledge and intent of Defendant, therefore, they became a part of his fraudulent scheme, resulting in loss to the SPCU.

The Court agrees that the loan reconstructions and trial testimony evidence that these pre-indictment loans to Defendant or his affiliated businesses were subsequently reset and/or

7

rolled into new loans fraudulently obtained and, therefore, constitute actual loss derived from his ongoing fraudulent activity.  See Trial exhibits 6Q (Trial Transcript pgs. 1693-1699, 1BB (Trial Transcript pgs.1783-1785), 9M, (Trial Transcript pg 1756-1759 and 11L (Trial Transcript pgs. 1706-1712).

Also, Defendant challenges the inclusion of fraudulent loan proceeds arising from the Alba Logistics account because Artur Hoxha testified he was in charge of running Alba during the time Defendant was incarcerated on an unrelated matter.  The Court finds that the testimony at trial established that Hoxha could not have obtained the loans without Defendant's intervention with Raguz.  Hoxha testified it was Defendant who instructed him how to obtain SPCU loans, had loans approved by Raguz and instructed Hoxha to leave checks for Raguz in order to obtain loans. (Trial Transcript pg. 848-863).  Therefore, the Government has met its burden to show actual losses attributable to Defendant arising from the Alba account.

Therefore, by adding the pre-indictment loans, the PACA settlement amounts and Government loss amounts adjusted to remove interest, the actual loss balance comes to $10,679,123.00.  This balance places Defendant above the $9,500,000.00 level, warranting a 20 level increase in his offense level.

This figure coincides closely with the Government's alternative loss calculation as reflected in Government Exhibit 78.  Federal Bureau of Investigation Special Agent Derek Kleinmann testified that actual proceeds, not including resets, that left the SPCU for the benefit of Defendant (ECF 116 pg3082) amounted to $10,514,497.00.  This provides substantial corroborating evidence of the actual dollars lost by SPCU as a result of

8

Defendant's criminal conduct.

Therefore, the Court finds the actual loss amount to be $10,679,123.00, warranting a 20 level increase in Defendant's total offense level.

### Substantially Jeopardizing the Safety and Soundness of a Financial Institution

Defendant challenges the Probation Department's addition of a 4 level increase under 2B1.1(b)(16)(B), which applies a 4 level enhancement when " the offense (i) substantially jeopardized the safety and soundness of a financial institution." The Commentary Application Note 13 lists the following non-exhaustive factors a court shall consider when determining whether a defendant's conduct substantially jeopardized the safety and soundness of a financial institution:

(i) The financial institution became insolvent.

(ii) The financial institution substantially reduced benefits to pensioners or insureds.

(iii) The financial institution was unable on demand to refund fully any deposit, payment, or investment.

(iv) The financial institution was so depleted of its assets as to be forced to merge with another institution in order to continue active operations.

(v) One or more of the criteria in clauses (i) through (iv) was likely to result from the offense but did not result from the offense because of federal government intervention, such as a "bailout."

Defendant argues that this enhancement should not apply to him because out of all the Defendants charged in the collapse of the SPCU, only Anthony Raguz received the

9

enhancement.  No other defendant received the enhancement, including Adnan Zai, whose loss amount exceeded that of Defendant.  While the enhancement should have been applied to Raguz given that SPCU losses attributable to him were determined to be $71 million,  Zai's loss was determined to be $16.7 million, yet the Government did not seek the enhancement for Zai.  Zai accepted a plea deal which did not include the enhancement but Defendant contends this should be immaterial to the Court's determination given the substantial difference in the amount of loss attributable to Zai compared to that of Defendant.  Given the disparity in losses caused by Raguz and Zai as compared to Defendant, Defendant argues his actions did not substantially jeopardize the safety and soundness of a financial institution.

According to the Government, Raguz's conduct is not a factor in the Court's determination whether to include the 4 level enhancement, rather, the Court must determine whether Defendant's own conduct jeopardized the safety and soundness of the SPCU.  The Government argues the total losses of SPCU were $72 million.  The Government argues losses attributable to Defendant amount to over $16 million, or more than twenty percent of the total losses incurred by SPCU.   In applying the enhancement to Defendant, the Government relies in part on the Sixth Circuit decision in *United States v. Sims,* 517 Fed. Appx. 439 (6th Cir 2013), wherein the Court held that losses equaling twenty percent of a bank's total losses and equaling the bank's earnings for the previous three years constituted conduct that jeopardized the safety and soundness of the financial institution.  Arguing that Defendant's loss amount is $16 million, the Government contends Defendant's conduct exceeds the twenty percent loss mark the Sixth Circuit in *Sims* determined to warrant the enhancement.  Furthermore, in 2010, the SPCU's net worth was $31,624,546.00.  By

10

subtracting losses attributable to Defendant, the SPCU's net worth was reduced by over 50%.

In the alternative, the Government asks the Court that in the event the Court does not find the 4 level enhancement applicable, the Court should find that a 2 level increase is warranted under 2B1.1(b)(16)(A) which applies if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by 2 levels."

The Government has the burden to demonstrate by a preponderance of the evidence that this enhancement applies.  It has not pointed the Court to any testimony by either the Special Agent or NCUA investigator that Defendant's conduct rendered SPCU insolvent.   In light of the Court's finding that the actual loss amounted to $10,679,123.00, nearly $6 million dollars less than the Government's recommended figure, the percentage of the total loss to the SPCU attributable to Defendant is roughly 14.7 percent, placing it below the 20 percent figure found by the Sixth Circuit to warrant the enhancement.  The Government has not offered any other caselaw and the Court is unaware of any law holding that a 14.7 percent loss in and of itself jeopardized the safety and soundness of a financial institution.  Furthermore, using the Government's Total Net Worth figure of $31,624,546 for SPCU for 2010, and subtracting the actual loss attributable to Defendant of $10,679,123.00, the SPCU still had a Net Worth of over $20 million.  In the absence of some additional evidence that such a figure rendered the SPCU insolvent, forced it to merge, prevented it from fully refunding on demand any payment, investment, or payment, or any other of the factors the Court must consider,  the Court finds the Government has not met its burden and the Court will not apply the 4 level enhancement.

11

However, the Court does find that the 2 level enhancement under 16(A)is appropriate as Defendant has conceded receipt of proceeds from the SPCU far exceeding $1,000,000 as required for the enhancement.   Therefore, the Court will apply a 2 level enhancement under 16(A).

### Money Laundering Convictions

The Government seeks the one level enhancement under Section 2S1.1(b)(2)(A) which reads, "if the defendant was convicted under 18 U.S.C. § 1957, increase by 1 level." Defendant does not contest this enhancement.   Therefore, because Defendant was convicted of six counts of Money Laundering, the 1 level increase applies.

### Role in the Offense

The Probation Department recommends a 2 level increase for Defendant's role in the offense as an "organizer, leader, manager or supervisor in any criminal activity" under U.S.S.G. § 3B1.1(c).  The Probation Department did not recommend the 4 level enhancement under Section 3B1.1(a), which allows for a 4 level increase when the criminal activity involved five or more participants because the Probation Department did not believe there was enough evidence to conclude that the tellers at SPCU were criminally responsible for the commission of the offenses.  The Government, however asks the Court to apply the 4 level enhancement.  According to the Government U.S.S.G.§ 3B1.1(a) provides a 4 level increase when a defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive..."   The Commentary Application Notes for Section 3B1.1 reads:

> 1. A "participant" is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not

12

criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant.

2. To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

3. In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

4. In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.
U.S.S.G. § 3B1.1

According to the Government, Defendant meets the above criteria and the enhancement is applicable. Defendant controlled the actions of Capoj and Hoxha. Trial testimony demonstrated that co-defendants Capoj and Hoxha were directed by Defendant to obtain loans from SPCU. When they were unable to obtain loans, Defendant directed them to go back to SPCU after he spoke to Raguz and they were able to obtain loans that they were originally denied. The Government further contends Raguz and two SPCU tellers were also involved in the activity, bringing the total participants to six when including

Defendant, Capoj and Hoxha.  Although not indicted, the Government argues that the evidence at trial demonstrated that the tellers were "participants" in the criminal enterprise of Defendant.

Defendant argues that neither the 2 nor the 4 level enhancement should be applied because Defendant was not an organizer, leader, manager or supervisor in the criminal activity.  Defendant contends that Capoj and Hoxha were already customers of the SPCU and had received loans from SPCU prior to entering into business with Defendant.  Although they were engaged in business together, the running of these businesses was not a criminal activity.  These co-defendants were friends, they were not named in the same counts and were never managed, controlled or organized by Defendant.

Having reviewed the trial evidence, the Court finds the 4 level enhancement under § 3B1.1(a) applies.  In *United States v. Moncivais*, 492 F.3d 652, 661 (6th Cir. 2007) the Sixth Circuit described the necessary showing to apply the enhancement:

> We note that the district court correctly concluded that it need not find that Defendant was an "organizer or leader" of five people in order to apply the enhancement. In addressing the analogous inquiry under 3B1.1(b), which provides a three-level enhancement if the defendant was a "manager or supervisor (but not an organizer or leader)," this Court stated that "there need only be evidence to support a finding that the defendant was a manager or supervisor of at least one other participant in the criminal activity, and that the criminal activity involved five or more participants or was otherwise extensive." *Henley,* 360 F.3d at 517. For the purpose of § 3B1.1(a), a "participant" is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.* at 518 (quoting U.S.S.G. § 3B1.1 cmt. n. 1).

At trial, Capoj testified he would not go to the SPCU to get loans for the East Side Farmers Market without instructions to do so from Defendant and it was Defendant who

determined the amount of the loan.  (Trial Transcript pg 2885).  Defendant would then direct

Capoj where to deposit the loan proceeds.  (*Id.*)   Hoxha testified similarly that Defendant

directed him to obtain new loans from SPCU, how to do so and to leave certain loan checks

with the SPCU. (Trial Transcript pgs 848-850).  When Hoxha questioned Defendant about the

fact that he obtained loans by signing a blank form, Defendant told Hoxha not to worry about

it. (Trial Transcript pgs 838-841).   This demonstrates Defendant's control over Hoxha and

Capoj.

The evidence also demonstrated that the tellers participated in resetting the fraudulent

loans and even attended a "pajama party" wherein the tellers, at the direction of Raguz, stayed

late into the night altering the SPCU books in order to hide from auditors the fraudulent loans.

Furthermore, the loan reconstructions demonstrate the tellers were involved in the loan resets.

Also, the Government points to Defendant's testimony that he dealt with one teller in

particular, D.P.,  extensively in obtaining the fraudulent loans.  In *United States v. Anthony*,

280 F.3d 694, 698 (6th Cir. 2002) the Sixth Circuit held that when determining who is a

participant under §3B1.1 a district court must consider "only that conduct which could lead to

a criminal conviction resulting in a term of imprisonment."  Moreover, the Sixth Circuit in

*Anthony* stated:

> Application Note 1 defines a participant as "a person who is criminally
> responsible for the commission of the offense, but need not have been
> convicted." U.S.S.G. § 3B1.1(a), Application Note 1. The guideline offers no
> further definition of "participant" or what it means to be "criminally
> responsible," but cases applying the guideline uniformly count as participants
> persons who were (i) aware of the criminal objective, and (ii) knowingly
> offered their assistance. *See, e.g., United States v. Lewis*, 68 F.3d 987, 989 (6th
> Cir.1995) (vacating sentence based on fact that other individuals did not
> knowingly participate in the offense and therefore could not be fairly
> considered "participants" under Section 3B1.1). On the other hand, "[a] person

who is not criminally responsible for the commission of the offense ... is not a participant." U.S.S.G. § 3B1.1(a), Application Note 1.

*Id.*

Because the testimony and evidence at trial as described above clearly demonstrates that the tellers were aware of the fraudulent loans being handed out to Defendant and willingly participated in the fraudulent scheme by resetting loans and altering SPCU records to hide the criminal conduct from auditors, they are participants under §3B1.1.  In light of this trial testimony and evidence, the Court finds there were more than five participants and Defendant controlled or managed at least one of the five participants (Capoj and Hoxha). Therefore, the 4 level enhancement is warranted.[2]

## Obstruction of Justice

The Probation Department recommends a 2 level enhancement for willfully obstructing or impeding or attempting to obstruct or impede the administration of justice.  The Probation Department points to Defendant's denial that he bribed Raguz as perjury warranting the enhancement.

U.S.S.G. § 3C1.1 contemplates a two level enhancement "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense..."

The Commentary's Application Notes on 3C1.1 describes the application and relevant

---

[2]     To demonstrate consistency and avoid departures, the Court notes that this 4 level enhancement was applied against Defendant Keith Ricks under legally similar circumstances in *United States v. Ricks,* Case No. 1:13CR345-1.

conduct necessary to include the enhancement and reads in pertinent part"

> This adjustment applies if the defendant's obstructive conduct (A) occurred with respect to the investigation, prosecution, or sentencing of the defendant's instant offense of conviction, and (B) related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) an otherwise closely related case, such as that of a co-defendant.

The Commentary makes it clear that a defendant is not to be punished merely for "the exercise of a constitutional right."  U.S.S.G. §3C1.1 cmt n 2.  " In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory..." *Id.*

Thus, an enhancement under Section 3C1.1 is  "limited to those cases in which the defendant intentionally lied on the stand.  Because the guideline was "not intended to punish a defendant for the exercise of a constitutional right," U.S.S.G. § 3C1.1, comment. (n. 2), "an enhancement is not warranted if the defendant merely testified untruthfully due to mistake or confusion. (Internal citation omitted).  Accordingly, the district court may not rely solely on the jury's verdict, but must instead make an independent finding that the defendant committed perjury."  *United States v. Kimberly,* 412 F. App'x 750, 755 (6th Cir. 2011)

To apply the enhancement, the Court must make certain particularized findings. "First, [the district court] must identify those particular portions of the defendant's testimony that it considers to be perjurious, and second, it must either make specific findings for each element of perjury or at least make a finding that encompasses all of the factual predicates for a finding of perjury.  In turn, the offense of perjury requires the establishment of three elements: that the defendant made (1) a false statement under oath (2) concerning a material

17

matter (3) with the willful intent to provide false testimony." *United States v. Macias Farias*, 706 F.3d 775, 782 (6th Cir. 2013) (internal citations omitted).  "[I]f an obstruction of justice enhancement is to be given for false testimony, the sentencing judge, who has the unique opportunity to judge the credibility of the witness, is required to make a clear finding that the defendant has lied with respect to testimony given under oath." *United States v. Lawrence*, 308 F.3d 623, 632 (6th Cir. 2002).

The Government first points the Court to the testimony of Defendant wherein he testified under oath that he did not offer bribes to Raguz in exchange for SPCU funds.

Concerning a loan for the terminal lease, Defendant denied giving Raguz a bribe.

Q.      Let me ask you another question.  Did you give Frank–or excuse me Tony Raguz a bribe to give you that loan?

A.      No.

(Trial Transcipt pg. 3382).

Concerning the loan for the G & M Express warehouse, Defendant denied giving Raguz a bribe.

Q.      Did you pay Mr. Raguz any bribes for him to give you a loan to purchase G & M Express building?

A.      No.

(Trial Transcript pg. 3387).

Concerning the loan for Capelli's Party Center, Defendant denied giving Raguz a bribe.

Q.      Did you pay Mr. Raguz a bribe to get that loan?

A.      No.

(Trial Transcript pg. 3395).

Concerning monies received from the SPCU after Defendant was released from prison up to the time of its collapse, Defendant denied giving Raguz a bribe.

Q.      Did you bribe Tony Raguz to receive that money?

A.      No.

(Trial Transcript pg. 3438).

Lastly, when asked about the entire time period Defendant received loans from SPCU Defendant denied bribing Raguz.

Q.      At any time during the period of time that you were receiving loans from Mr. Raguz, did you bribe him?

A.      Never.

(Trial Transcript pg 3466).

Defendant's repeated denials of bribery stand in stark contrast to the overwhelming testimony and evidence against him.  First, Anthony Raguz testified :

Q. Do you see anyone in this courtroom that bribed you in

order to defraud the credit union?

A. Jimmy.

(Trial Transcript pg. 1077).

Raguz testified that Defendant bribed him in return for loans that occurred for years. (Trial Transcript pg. 1160-1189).  These bribes occurred after the loan proceeds were disbursed.  (Trial Transcript pg.1176).  Hoxha testified under oath that Defendant told him

you need to "take care of [Tony] sometimes." (Trial Transcript pg 929).  Hoxha and Capoj

both testified they were instructed by Defendant to obtain loan proceeds from SPCU for

Defendant and leave checks behind for Raguz.  (Trial Transcript pgs. 847-50 & 2884-85,

2890).  Aziz Ukshini testified as follows:

> Q.  Did he tell you anything to do for Tony?
>
> A.  I mean, yeah.  We have to, you know, we have to take care of him.
>
> Q.  Who said we have to take care of him?
>
> A.  Him, the defendant.
>
> Q.  And what does it mean to take care of Tony?
>
> A.  Bribe him, you know.

(Trial Transcript pg 2590).

Furthermore, the Government's loan reconstructions and supporting materials as

described  in the Court's Opinion and Order on Defendant's Motion for Judgment of

Acquittal or for New Trial (ECF #142, pg 4017) demonstrates that bribe payments were made

by Defendant to Raguz.

This overwhelming evidence belies Defendant's testimony under oath that he did not

bribe Raguz in exchange for loan proceeds.  A clear pattern of bribes in exchange for loans

emerged from the trial evidence with co-defendants and associates of Defendant testifying

that Defendant bribed Raguz in order to obtain loan proceeds he never intended to repay.

Thus, the evidence demonstrates Defendant falsely testified under oath that he did not

bribe Raguz.  Moreover, given that this conduct occurred for years and involved many bribes,

Defendant's testimony simply cannot be attributed to confusion or mistake and is blatantly

inconsistent with the jury's finding of guilt.  Having been charged with five counts of Bribery, the issue of his bribing Raguz was material to his conviction and, given the length of time and number of loan he received, Defendant's denial of bribery in light of the overwhelming evidence to the contrary constituted perjury and justifies the 2 level enhancement.

Therefore, for the foregoing reasons, the Court finds Defendants total offense level to be 36.

IT IS SO ORDERED.


s/ Christopher A. Boyko
CHRISTOPHER A. BOYKO
United States District Judge

Dated:  December 14, 2015